STATE EX REL. R. C. ARPAGAUS AND ANOTHER v. GEORGE TODD.[1]

November 21, 1947.

No. 34,544.

---

[1]Reported in 29 N. W. (2d) 810.

*Karl H. Covell* and *Richard H. Bachelder,* for relators.
*Leonard, Street & Deinard* and *Douglas Hall,* for respondent.

MAGNEY, JUSTICE.

An information in the nature of quo warranto to test the right of respondent to the office of alderman for the twelfth ward of the city of Minneapolis was filed in this court, and a writ issued. The proceeding was instituted with the consent of the attorney general by private relators who are residents, voters, and taxpayers of said ward.

On November 29, 1946, the city council of Minneapolis appointed George Todd, respondent here, to fill a vacancy in the office of alderman of the twelfth ward. At the next general city election, held June 9, 1947, Todd was elected for a term commencing on the first Monday of July 1947 and expiring on the first Monday of July 1949.

On December 22, 1930, in the United States district court for Minnesota, respondent entered a plea of guilty to an indictment charging him with the crime of illegally manufacturing intoxicating liquor. The court entered its judgment of conviction, and respondent served a sentence in prison.

On June 28, 1947, between the time of his election and the time of taking office, respondent procured a pardon from the President of the United States for said crime and his conviction therefor for the purpose of restoring him to his civil rights.

Under federal law, the crime for which respondent was convicted was a felony. Under the laws of Minnesota in force at the time of his conviction, it was a misdemeanor.

Minn. Const. art. 7, § 2, provides:

"Sec. 2. No person not belonging to one of the classes specified in the preceding. section; *no person who has been convicted of treason or any felony, unless restored to civil rights;* and no person

under guardianship, or who may be *non compos mentis* or insane, shall be entitled or permitted to vote at any election in this State." (Italics supplied.)

Section 7 of the same article provides:

*"Every person who by the provisions of this article shall be entitled to vote at any election shall be eligible to any office* which now is, or hereafter shall be, elective by the people in the district wherein he shall have resided thirty days previous to such election, except as otherwise provided in this Constitution, or the Constitution and law of the United States." (Italics supplied.)

Eligibility for any public office in Minnesota is thus expressly made to depend upon the right to vote. Relators contend that respondent, because of his conviction in the federal district court of violation of a law which is classified as a felony under the federal statutes, was ineligible to hold public office and was not entitled to vote at the June 9, 1947, election, and that therefore he is not eligible to hold the office of alderman to which he was elected at that time. They claim that the pardon given respondent by the President of the United States between the time he was elected and the time his term commenced does not alter the situation.

The first question presented is whether these two resident voters and taxpayers of a city ward who claim no right or interest different from that of any other resident voter and taxpayer of the ward can maintain a proceeding of this kind in this court to secure the ouster of respondent from office.

Respondent contends that these private relators were not entitled to bring this action because (a) they had no interest in the matter different from that of any other member of the public; (b) they had other remedies, such as an election contest or an action to bar respondent's name from going on the ballot; and (c) the public interest did not require the action to be brought. These were pertinent questions for this court to consider in determining whether it would exercise its discretion in favor of permitting these relators to proceed. However, since this court has already permitted the in-

formation for the writ to be filed and has upon that information issued its writ, it has already exercised its discretionary power favorably to relators and, in the exercise of that discretion, has determined that these private relators have a right to bring this proceeding and that the public interest and welfare requires this court to entertain it. The rule was laid down in State ex rel. Young v. Village of Kent, 96 Minn. 255, 258, 104 N. W. 948, 949, 1 L.R.A. (N.S.) 826, 6 Ann. Cas. 905, where this court said:

"We are of the opinion that the court exhausts its discretion when it exercises it upon the preliminary application for leave to file the information."

It further stated (96 Minn. 271, 104 N. W. 955):

"The principle is thus firmly established in this state that the granting or withholding of leave to file an information at the instance of a private relator, or of a private relator with the consent of the attorney general, to test the right to an office or franchise, rests in the sound discretion of the court to which the application is made, even though there is a substantial defect in the title by which the office or franchise is held." (Citing cases.)

These preliminary and jurisdictional questions have therefore already been passed upon and disposed of.

■ Having thus passed the jurisdictional questions raised by respondent, we are confronted with the disposition of the case on its merits. The question presented is whether respondent is now qualified to hold the office to which he was elected, despite his conviction in 1930 in a federal district court of an offense committed in Minnesota which was a felony under the federal law, but only a misdemeanor under the Minnesota law.

The authorities are not in agreement on this question. We shall not attempt to discuss all the cases cited by counsel. It seems unnecessary to do so. We shall, however, consider the leading cases upon which they rely.

State ex rel. Olson v. Langer, 65 N. D. 68, 256 N. W. 377, cited by relators, supports their position. There, one of the justices wrote a strong dissenting opinion. The facts in that case are as follows: Langer, the respondent, was elected governor of North Dakota in November 1932. Olson, the relator, was elected lieutenant governor at the same election. Both qualified and took their respective offices in January 1933. In May 1934, Langer was convicted in a federal court of an offense which was a felony under the federal statutes but only a misdemeanor under the laws of North Dakota. The North Dakota constitution has a provision similar to that of Minnesota heretofore quoted, to the effect that a person who has been convicted of a felony and whose civil rights have not been restored is not a qualified elector of the state, and, not being a qualified elector, that he is consequently ineligible to hold public office. The supreme court of North Dakota held that the conviction of the governor in the federal district court constituted a "disability," causing the powers and duties of the governor to devolve upon the lieutenant governor for the residue of the term of office for which the governor was elected, or until removal of the "disability." The court said (65 N. D. 91, 93, 256 N. W. 387, 388) :

"It seems to us unthinkable in view of the purpose underlying § 127 [the section of the North Dakota constitution above referred to] and the inter-relationship between the state and the United States, that an elector who has committed the most serious of offenses—for example, treason, or murder, or robbery—and who has been convicted therefor in the federal court, should not be disqualified to exercise the elective franchise in North Dakota where the offense was committed. Neither can the fact that the offense of which the respondent in the instant case was convicted may by some be considered as not a serious one make any difference in the application of the rule. The constitutional provision establishes a rule for all cases and in its application the merits of any individual case cannot be considered. * * * every logical reason supports the disqualification. * * * [Citing cases.]

* * * * *

"The respondent further insists, that even if a conviction of felony in the federal court be within the contemplation of § 127, nevertheless such conviction must be for an offense also made felony by the statutes of the state; * * *. In disposing of this contention, we again must look to the theory and purpose underlying the constitutional provision. As we have shown, the reason for the disqualification therein provided is to protect the state by insuring that only those mentally and morally qualified shall participate in its elections. Acts constituting felony may differ in different jurisdictions. Statutes simply embody the standard established by the public conscience in those jurisdictions where they are enacted. Public sentiment may vary and standards change accordingly. But he who violates the statute must be held to know what he is doing when he does the prohibited act and to know the consequence in the way of penalty. His personal standard cannot be the measure of the character of the act or its depravity. The standard established by the law-making body of that jurisdiction must do that. [Citing cases.] Accordingly, he who sets himself above the law and does an act, regarded by the United States as of so serious a nature as to be prohibited and penalized as a felony, may well be held in this state to be unfit to participate in governmental affairs. * * * We therefore hold that consistent with the theory and purpose of § 127, whether an offense for which a conviction is had is a felony must be determined by the law of the jurisdiction where it is committed."

The reasoning in the Langer case was followed in State ex rel. Barrett v. Sartorius, 351 Mo. 1234, 175 S. W. (2d) 787, 149 A.L.R. 1067, decided in December 1943. The question involved in that case concerned the refusal of the board of election commissioners of the city of St. Louis to permit one C. L. Owen to be registered as a qualified voter. In that case, Owen had been convicted in federal court of a felony, which under the laws of Missouri was only a misdemeanor. Three of the seven justices concurred in the result on a ground set out in the concurring opinion, but they strongly disapproved of the reasoning in the Langer case. The

justice writing the concurring opinion said (351 Mo. 1246, 175 S. W. [2d] 791):

"* * * I do not agree to the sweeping conclusion that the constitutional provision and statute, supra, refer to *any* felony under the laws of any other jurisdiction, regardless of whether the same act would be a felony or any crime at all, if committed in Missouri. As a matter of fact, evasion of payment of state income tax in Missouri is only a misdemeanor. * * *

"* * * And let it be further conceded, as the principal opinion holds, that the purpose of a statutory disqualification to vote because of a prior conviction of a felony, is imposed to safeguard the purity of elections and to fix minimum moral standards for voters. But granting that, is it not *this* State which prescribes the moral qualifications of *its* voters, and not one of the forty-seven other States, or the Federal Government? Have we by the constitutional and statutory provisions aforesaid turned over to those other jurisdictions the power to impose conditions of disfranchisement upon our voters, or put it in the hands of the governor of some other state to reinstate them by a pardon for a crime committed there?

"Answering respondent's restrictive contention, the relator members of the Election Board. in their reply brief very pertinently inquire whether it can be said 'with any semblance of reason or logic, that (the people) intended that one guilty of a "Missouri felony" should be *disqualified,* but that one guilty of an equally reprehensible act under the laws of another jurisdiction should remain *qualified?*' Another case, Crampton v. O'Mara, 193 Ind. 551, 557(5), 139 N. E. 360, 362(4) declares such a course would be 'anomalous, illogical, and unjust.' But turn that proposition around and look at the converse of it. Would it not be equally unjust and discriminatory to deny a citizen of this state the right to vote because he had previously been convicted of an unpardoned crime in another state, which that state had denominated a felony, while at the same time other citizens of Missouri were doing the same

thing every day in our very presence, and yet voting without hindrance because the act is only a misdemeanor, or not a criminal offense at all, in Missouri?

"True, it could be said of the disfranchised voter that he had violated the law of the foreign state where he was when he committed the act, but it seems to me if the purpose of the disqualification is to fix the *moral* standards of voters, then this state and no other is the one to say what those standards shall be." (Italics in text.)

After critically discussing the language in the Langer case, which was quoted in the majority opinion, the concurring opinion continued (351 Mo. 1248, 175 S.W. [2d] 792):

"The Langer case further says it would be 'unthinkable' to affirm that one who had committed treason, murder or robbery in North Dakota and been convicted of the crime in the Federal Court, should not be disqualified as a voter in that state. This is quite true, of course, if those crimes are felonies in North Dakota, as we assume they are. But the fact that the crime had been committed in a federal jurisdiction overlapping the state, otherwise would not make it an offense against the state of North Dakota anymore than if it had been committed in a wholly different state. The court systems, laws and rights of franchise of the two jurisdictions would be wholly different and separate.

"The Langer case evidently was decided under some political stress. * * *

"* * * If, as the relators and the above cases reason, it is unthinkable that a person convicted of a Missouri felony in Missouri should be disqualified, whereas one guilty of an equally reprehensible act under the laws of another state is not disqualified, that is simply another way of saying in reverse that the outstate felony ought to be of the same kind and nature as the Missouri felony. And we apply that rule even as to common criminals in our habitual criminal statute, Sec. 4855."

We have quoted from the concurring opinion at great length, since it expresses lucidly and forcibly our views on the question submitted to-us. If two men, both citizens of this state, were jointly engaged in an illegal act in this state and both of them were arrested, one by the federal authorities and the other by the local authorities, and one was convicted in the federal court of a crime constituting a felony under the federal law and the other was convicted of an of-fense constituting a misdemeanor under Minnesota law, it does not seem reasonable that, for the commission of the same act, the one convicted in federal court should forfeit his civil rights, while the one convicted in the state court should not. The discrimination seems unfair. In the Langer case, the court states that the purpose of imposing the disqualification (65 N. D. 90, 256 N. W. 387) "is the protection of the state by denying the privilege of the franchise to those whose unfitness is evidenced by conviction of felony. * * * The commission of the act and not the conviction therefor works the disqualification, * * *." However, since the act was merely a mis-demeanor under the laws of North Dakota, conviction for the act in the state court would not work a disqualification. Therefore, it fol-lows that *conviction* for the act in the federal court worked the dis-qualification, not the act itself. The jurisdiction which judged the act was the factor which worked the disqualification.

Repeating what the court said in the Langer case (65 N. D. 93, 256 N. W. 388):

"* * * Acts constituting felony may differ in different jurisdic-tions. Statutes simply embody the standard established by the public conscience in those jurisdictions where they are enacted. Public sentiment may vary and standards change accordingly."

Professor Wigmore terms it (2 Wigmore, Evidence [3 ed.] § 522, note 3) "the diversity of ideas as to criminal conduct." Here, the crime for which respondent was convicted was classified as a mis-demeanor in this state. That represented the standard established by the public conscience of this state when the statute was enacted. As stated in the concurring opinion in the Barrett case (351 Mo.

1247, 175 S. W. [2d] 791), "is it not *this* State which prescribes the moral qualifications of *its* voters, and not one of the forty-seven other States, or the Federal Government?" (Italics in text.)

There was a strong dissenting opinion in the Langer case. In 2 University of Chicago L. Rev. 333, 334, where the Langer case is reviewed, it is stated:

"* * * the court might well have required the conviction to be for a felony within the state, *or at least for an act which is considered a felony by local law.*" (Italics supplied.)

See, comment in 48 Harv. L. Rev. 687, where the writer states relative to the Langer case:

"Since the case presented a problem of construction only, the dissenting judge seems correct in attempting to find the intention of the framers of the constitution. Furthermore, disqualification statutes are generally construed strictly."

Respondent cites as one of his leading cases In re Donegan (1940) 282 N. Y. 285, 26 N. E. (2d) 260. That case involved disbarment of an attorney. Such cases, which challenge an attorney's privilege to practice law, are of course in a category different from the kind of cases we have been considering and the one here presented. The Donegan case, however, is of interest and helpful, and the reasoning therein fits the facts of the instant case. There, Donegan was convicted in the federal court in New York of conspiracy to use the mails to defraud. The offense was a felony under the federal code. Under the law of New York, however, a conspiracy to commit a crime is only a misdemeanor. The New York Judiciary Law, § 88, provides for the summary removal from the roll of attorneys of an attorney "convicted of a felony" upon presentation to the court of the judgment of his conviction. A separate section of the law provided that any attorney "convicted of a felony" should cease to be an attorney. The statute is self-executing, as is the constitutional provision in the instant case. Acting under both sections, the New York court, without a hearing, struck Donegan's name from the roll upon presentation of the judgment of his conviction. The appellate

court concluded that conviction of a felony under federal law was not ground for summary disbarment unless the offense constituted a felony under New York law. The court said (282 N. Y. 288, 290, 292, 26 N. E. [2d] 261, 262, 263):

"* * * We are not concerned with the merits. The question presented is solely whether the term 'felony,' as employed in the above sections of the Judiciary Law, providing for summary, permanent disbarment, includes an offense defined as a felony by Federal statute, which, if cognizable under the laws of New York, would at most be a misdemeanor, since, as already noted, in general, conspiracy under the laws of this State does not rise above that category of crime.

"Section 88 of the Judiciary Law, though including at least some form of Federal crime, is ambiguous as to the following three situations: (1) Where an offense is a felony under Federal law and also a felony under the New York law; (2) where an offense is a felony under Federal law but is a crime less than a felony in this state; (3) where an offense is a felony solely under Federal law and is not cognizable at all under our laws. It is submitted that only the first of the three categories is covered by section 88 of the Judiciary Law. Otherwise, there would be the anomalous result whereby the statute would require the Appellate Division summarily to disbar for life without the possibility of modification for an offense which is a felony under the laws of the United States but which, if punished by the laws of this State, would permit of a hearing and less severe results.

\* \* \* \* \*

"* * * Strict construction of section 88, subdivision 3, and section 477 of the Judiciary Law requires that the term 'felony' include only those Federal felonies which are also felonies under the laws of this State, and exclude such Federal felonies as are 'cognizable by our laws as a misdemeanor or not at all.' "

In People ex rel. Atkins v. Jennings, 248 N. Y. 46, 161 N. E. 326, the governor commuted sentence upon "the express condition that

if the said Burd R. Atkins shall hereafter be convicted of any felony, committed during the period between the day of his discharge by reason hereof and the date of the expiration of the full term hereby commuted, he shall be deemed an escaped convict." During the period above referred to, Atkins was convicted of larceny in the state of Michigan. The court said (248 N. Y. 52, 161 N. E. 328) :

"With greater force, it is urged that crimes may be felonies in other States which are not felonies in New York within the meaning of the commutation. Relator, it is said, was convicted of larceny. In this State petit larceny is a misdemeanor. The same acts may be a felony elsewhere. * * * If the offense for which relator was convicted would be cognizable by our laws as a misdemeanor or not at all, it cannot be included in the standard of crime that the Governor had in mind when the sentence was commuted."

In In re Jacoby, 74 Ohio App. 147, 153, 57 N. E. (2d) 932, 935, the court, in commenting on the Donegan case, stated:

"The decision in the Donegan case turned upon the definition of a felony. The court, after tracing the development of classification of crimes into felonies and misdemeanors, pointed out that the classification merely represented the view which the given jurisdiction takes of the gravity of the offense; that crimes might be felonies in other jurisdictions which did not fall within the New York definition of a felony; and that the respondent was convicted of a crime, which, though a felony under United States statutes, was only a misdemeanor under the New York law. Thus the case rests merely upon the *classification* of crimes. Granting for the sake of argument that the conclusion is sound when applied to the New York law (it is much weakened by Judge Loughran's dissenting opinion), its persuasiveness is lost when applied to the Ohio statute. Disciplinary action under the Ohio statute does not rest upon the classification of crimes into felonies and misdemeanors." (Italics in text.)

M. S. A. 610.28 provides:

"Every person who, after having been convicted in this state of a felony or an attempt to commit a felony, or, under the laws of any other state or country, of a crime *which, if committed in this state, would be a felony,* commits any felony or attempts to commit any felony, in this state, upon conviction thereof, shall be punished as follows: [setting out the provisions for increased punishment]." (Italics supplied.)

Thus the criminal cannot be subjected to additional punishment unless the crime for which he was convicted in any other state or country constitutes a felony under the laws of this state. A conviction in another jurisdiction of a felony which is classified as only a misdemeanor in this state does not, under the statute, bring on the aggravated punishment. That seems like sensible legislation. It seems equally sensible to say that the intention of the framers of our constitution was that there should be no forfeiture of civil rights unless the crime for which the voter was convicted in another jurisdiction constituted a felony under the laws of this state. The voter should not be placed in a worse position than a felon twice convicted.

We are of the opinion that respondent, although convicted in a federal district court of this state of an offense which is a felony under federal law, but only a misdemeanor under the statutes of this state, has not thereby forfeited his civil rights. Therefore, he was eligible to vote at the June 9, 1947, election and eligible to hold the position of alderman for the twelfth ward of the city of Minneapolis. In our view of the case, it is not necessary to discuss the effect of the presidential pardon.

Writ discharged.